UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TERRELL JAMES ROBEY,

    Plaintiff,

    v.      CAUSE NO. 3:22-CV-71-JD-MGG

DR. CHICO, et al.,

    Defendants.

OPINION AND ORDER

Terrell James Robey, a prisoner proceeding without a lawyer, moves for a preliminary injunction related to his alleged need for mental health treatment. (ECF 1.) The court ordered a response to his request, which has now been received. (ECF 24.)

Mr. Robey is currently incarcerated at Indiana State Prison ("ISP"). He was granted leave to proceed on an Eighth Amendment claim against Dr. Christina Chico, a prison psychologist, for failing to adequately treat his "severe depression" from October 2021 to the present. (ECF 3.) He was also granted leave to proceed on a claim for injunctive relief against Warden Ron Neal related to his need for medical care for depression, and his ongoing need for protection from other inmates.[1] (*Id.*) In support of his request for a preliminary injunction, he argues that he is in immediate need of medication for severe depression to prevent him from committing suicide. (ECF 1 at 7.)

---

[1] The court dismissed a number of his other claims at screening. (ECF 3.)

He also argues that he is at immediate risk of being harmed by other inmates because they believe him to be a snitch, and asks to be placed in protective custody. (*Id.*)

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Furthermore, mandatory preliminary injunctions—"those requiring an affirmative act by the defendant" like the one Mr. Robey seeks—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is significantly circumscribed; any remedial injunctive relief "must be narrowly drawn, extend no

2

further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citations and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining the strict limitations on granting injunctive relief under the Prison Litigation Reform Act).

Under the Eighth Amendment, inmates are entitled to adequate medical care for serious medical conditions. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). However, they are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care.") (citation and internal quotation marks omitted). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. Furthermore, "[i]t is firmly established . . . that mere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and internal quotation marks omitted). Instead, the court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is

not enough" to establish an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). To prevail, the inmate must show deliberate indifference, "a culpability standard akin to criminal recklessness." *Thomas*, 2 F.4th at 722.

The Eighth Amendment also imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates" and to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). However, "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010).

Addressing first Mr. Robey's need for protection from other inmates, documentation submitted by the Warden reflects that Mr. Robey was approved for protective custody on February 25, 2022. (ECF 24-1; ECF 24-3 at 10.) There are currently no beds available in ISP's protective custody unit, however, so Mr. Robey is being held in the restrictive housing unit (RHU), where he is assigned to a single cell and escorted by staff at all times. (ECF 24-1.) He is awaiting a transfer to another facility with space available in the protective custody unit, which should be occurring imminently. (*Id.*) Until his transfer, he will remain in RHU. (*Id.*) Based on this documentation, the court

4

concludes that the Warden is taking adequate steps to protect Mr. Robey from harm. He has not demonstrated an entitlement to a preliminary injunction on this issue.

Regarding his medical care, the nearly 100 pages of medical records submitted by the Warden reflect that at the time of his arrival at ISP in October 2021, he did not have a current diagnosis of mental illness, nor was he taking any psychotropic medication. (ECF 24-2 at 1-6.) In fact, although he has reported to staff that he took some type of medication as a child, the record reflects that he has not had any mental health diagnosis or received psychotropic medication at any point during his lengthy incarceration.[2] (*Id.* at 12, 15, 77.) At his prior facility, he had been placed on suicide watch after he was observed by staff stuffing a t-shirt in his mouth and tying part of it around his neck. (*Id.* at 7.) However, he was assessed by a psychologist upon his arrival at ISP and found to be free of mental illness. (*Id.* at 1.)

He was seen by medical staff a few days after his arrival for an unrelated issue and did not report any mental health concerns. He was observed to be "laughing and talking with other patients" while in the medical unit. (*Id.* at 6.) A few days later, he was sent to RHU for refusing a housing assignment and other disciplinary infractions. (ECF 24-3 at 1.) Since then, he has been assessed by mental health staff numerous times. (ECF 24-2 at 7-90.) Dr. Chico conducted an assessment on October 11, 2021, and found Mr. Robey to be "cooperative and communicative." (*Id.* at 7.) They discussed his concerns as a member of the LGBTQ community and someone who sometimes identifies as female,

---

[2] Public records reflect that Mr. Robey is serving a 55-year sentence for an offense committed in 2003. *See Robey v. State*, 908 N.E.2d 368 (Ind. Ct. App. 2009).

but his mental status, appearance, eye contact, speech, and thought processes were all observed to be normal. (*Id.*) She noted that he presented traits of narcissistic personality disorder. (*Id.*) He told her at one point during the interview that he would "act a fool and fuck up staff" if he was given a housing assignment that he felt put him at risk. (*Id.*) Based on her evaluation, Dr. Chico concluded: "Patient does not present any mental health issues at this time."[3] (*Id.* at 8.)

He was seen by mental health staff on October 25, 2021, who again concluded that his mental functioning was normal. (*Id.* at 15-20.) It was noted that he was "demanding" toward the staff member and showed minimal insight into his behavior. (*Id.*) He was unhappy with his housing assignment and wanted to be transferred to another facility. (*Id.*) He threatened litigation during the interview. (*Id.* at 20.) He was seen again by mental health staff a few days later, but he only asked for some personal items. (*Id.* at 26.) Staff noted "no visual signs that should elicit concern." (*Id.* at 26-29.)

On November 26, 2021, he was seen in the medical unit with a "superficial" laceration on his forearm. (*Id.* at 31.) He reported that he was suicidal. (*Id.*) The nurse washed his wound and covered it with a bandage. (*Id.*) He was subsequently placed on suicide watch. (*Id.*) He was assessed by mental health staff on November 27, 2021, and November 28, 2021, and was observed to be functioning normally. (*Id.* at 35-40.) On November 29, 2021, he was assessed by Dr. Chico, who found his mental status, activity

---

[3] Medical records reflect that Mr. Robey has a history of substance abuse. A few days after this meeting with Dr. Chico, he was given Narcan for an apparent overdose after being found unresponsive in his cell. (ECF 24-2 at 14.)

6

level, appearance, speech, and thought processes to be normal. (*Id.* at 40.) He reported that he had cut himself because he was having a "horrible experience" on his range and wanted to be moved to the other side of the range. (*Id.* at 41.) He threatened to cut himself again if he was not moved. (*Id.*) Dr. Chico determined that he did not have any actual suicidal ideations and instead was angry about his housing assignment. (*Id.*) In her professional opinion, it would "reinforc[e] negative behaviors" to keep him on suicide watch. (*Id.*)

Later that night, he was seen by a nurse, who reported that he told her was "suicidal/mad about housing assignment." (*Id.* at 47.) She reported him as being "rude" throughout their interaction, including telling her, "You got a slick ass mouth." (*Id.*) He refused to have his vital signs taken. (*Id.*) He reported to the nurse that he had cut himself again, and she asked him, "where?" because she did not observe any visual injuries. (*Id.* at 50.) He showed her his wrists, which had some dried blood on them but were not actively bleeding. (*Id.*) He also told the nurse that two inmates had threatened him. (*Id.*) The nurse reported that he was acting "overdramatic," and at one point lay on the floor and said he felt dizzy, but then began laughing when she made a joke. (*Id.*) The nurse called Dr. Chico, who said she had "just talked to him under 12 hours ago" and found no basis to put him back on suicide watch. (*Id.*) Dr. Chico also reported to the nurse that she had spoken to the prison's internal affairs department about Mr. Robey's security concerns. (*Id.*)

Mr. Robey was seen again by mental health staff on December 20, 2021, in response to a health care request. (*Id.* at 57.) He reported feeling "depressed" but

"would not provide further details" when the staff member tried to ask him about his symptoms. (*Id.*) He again asked to be moved to the other side of the range. (*Id.*) He mentioned his lawsuit several times, and at one point stared at the staff member and said, "You'll be named too." (*Id.*) Later that same day, he was seen by Dr. Chico. (*Id.* at 59.) He asked for medication, but when she tried to discuss his symptoms with him he was "non-cooperative" and eventually told her to "get away from my cell." (*Id.*) Dr. Chico did not observe any mental health symptoms, but concluded instead that he had "antisocial traits." (*Id.*) She noted that he "appeared to be attempting to use the encounter for secondary gain," namely to obtain a different housing assignment. (*Id.*)

He was seen by a different psychologist on January 13, 2022, in response to a health care request, but she was "unable to assess him" because he "did not want to engage" with her. (*Id.* at 67.) He reported to her, "I don't need to talk, I'm good." (*Id.*)

Dr. Chico assessed him again on February 23, 2022, and found him to be free of mental illness. (*Id.*) She noted that he was "manipulative" and "demanding" during the interview. (*Id.*) They discussed whether he wanted to pursue hormone replacement therapy for his gender identity issues, but he did not want to make a decision at that time. (*Id.*) Much of the time he talked about the lawsuit he had filed against her and at one pointed "mocked" something she said. (*Id.*) He asked for medication, but when she told him normally the first step would be to engage in therapy, he was "not receptive." (*Id.*) She concluded that he "does not meet the criteria for any mental health diagnosis," but planned to see him in another 30 days to discuss possible hormone replacement therapy. (*Id.* at 81-83.)

Shortly after the meeting with Dr. Chico, Mr. Robey's chart was reviewed by John G. Martin, M.D., for possible medication management. (*Id.* at 82-83.) The doctor concluded that Mr. Robey did not have depression or other mood disorder, and instead had a personality disorder. (*Id.*) He found "no reason for putting the inmate on antidepressants." (*Id.* at 83.) He declined to prescribe any medication or refer Mr. Robey for psychiatric services. (*Id.*)

Mr. Robey was seen again by mental health staff on March 2, 2022, in response to a health care request. (*Id.* at 89.) He said he wanted medication but would not elaborate. (*Id.*) His affect, speech, demeanor, and thought processes were all observed to be normal. (*Id.*)

As outlined above, the medical records reflect that Dr. Chico and other mental health staff have diligently responded to Mr. Robey's requests for care health care requests and evaluated him for possible mental illness on a number of occasions. Their professional view is that he is not suffering from depression and is not in need of medication; rather, they have concluded based on multiple assessments that he is attempting to manipulate them. The court must defer to the treatment decisions of prison medical providers unless no minimally competent professional would have responded as they did. *Walker*, 940 F.3d at 965. In light of the record, Mr. Robey has not demonstrated a likelihood of success on his claim that Dr. Chico has been deliberately indifferent to a serious medical need, nor has he demonstrated that he will suffer irreparable injury if he is not granted immediate relief.

For these reasons, the plaintiff's motion for a preliminary injunction (ECF 1) is DENIED.

SO ORDERED on March 16, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT